**UNITED STATES of America ex rel.
Thomas Edward GIBSON,
Appellant,**

**v.**

**Edward ZIEGELE, Superintendent of
Leesburg Prison.**

**No. 72–1883.**

United States Court of Appeals,
Third Circuit.

Argued April 5, 1973.

Decided May 22, 1973.

---

Donald G. Targan, Atlantic City, N. J., for appellant.

Solomon Forman, Asst. County Prosecutor, County of Atlantic, Ernest M. Curtis, Atlantic City, N. J., for appellee.

Before McLAUGHLIN, ROSENN and HUNTER, Circuit Judges.

JAMES HUNTER, III, Circuit Judge.

Thomas Gibson was convicted after his second trial in the criminal courts of Atlantic County, New Jersey of manslaughter in the knifing death of his

wife Bessie. Gibson's first trial had ended in a mistrial over his objection when a key prosecution witness became ill during the trial and could not testify. After exhausting his state remedies, appellant filed a petition for a writ of habeas corpus in the United States District Court for the District of New Jersey seeking his release from prison primarily on the grounds of double jeopardy. This petition was denied without a hearing and we affirm.

## I

A summary of the events surrounding the declaration of mistrial is appropriate. On October 23, 1969, indictments were returned against Gibson charging him with murder and atrocious assault and battery. His first trial began on April 13, 1970, and the prosecution presented several witnesses including Sergeant Tomasello of the Pleasantville Police Department, Detective Horner of the Atlantic City Police Department, and Moses Murray, the defendant's brother-in-law. Murray testified that there was an altercation between him and Gibson in the latter's apartment, that Gibson stabbed him on the steps outside the apartment, and that after he was stabbed he saw the defendant go back into the apartment where Bessie Gibson was later found dead. Sergeant Tomasello testified that on the night of the alleged murder, Gibson came to the Pleasantville police station and stated that he wanted to file a complaint against his wife because she had assaulted him with a knife. Tomasello also said that the defendant told him that "he took the knife from her and gave it back to her, and that she wasn't going to use the knife on him anymore . . . ." Finally, Detective Horner's testimony is relevant because he referred to Murray as the "accused" at one point, and, although he later said that this was a mistake, appellant contends that this so-called "Freudian slip" had "a tremendous impact on the course of the trial." As a further indication that the state's case was going poorly, appellant's counsel says that the prosecutor approached him and offered to recommend a dismissal of the murder indictment in its entirety if Gibson would plead guilty to the charge of atrocious assault and battery against his wife. This offer was refused.

On the afternoon of April 15, 1970, the trial was recessed until the following morning because a key prosecution witness, Captain Wilson of the Atlantic City Police Department, was reported too ill to testify. Wilson had been in charge of the investigation, and he had obtained a signed confession from the defendant on the night of the murder which the prosecution wanted to enter into evidence. On the morning of April 16, 1970, the recess was extended until noon while the court attempted to ascertain the seriousness of Captain Wilson's illness. At 2:05 p. m. the prosecutor moved for a mistrial on the ground that Captain Wilson had suffered a coronary insufficiency and would be unable to testify for several weeks. The defense objected, arguing that the absence of one witness was not enough to justify a mistrial and indicating that in any event Chief Mortimer Nappen could introduce the confession. Defense counsel then moved for a continuance to obtain a written doctor's report and to allow him twenty-four hours to research the double jeopardy issue. The trial judge stated that he had talked by telephone with the attending physician, and was informed that Captain Wilson had contracted an intestinal grippe with acute coronary insufficiency and would be unable to testify for one to two weeks or more. After considerable discussion between the parties, the trial judge denied defendant's motions and granted the prosecutor's motion for a mistrial. Since Captain Wilson had been present on the first day of the trial, it is evident that he would have been available as a witness if he had not become ill.

## II

Gibson's primary contention on this appeal is that the Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth

Amendment, Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), barred his second trial under a murder indictment. In connection with this allegation, appellant also asserts that he could not be tried *twice for the* same crime because the second trial afforded the prosecution a more favorable opportunity to convict him. We disagree with both of these arguments.

The Fifth Amendment's prohibition against placing a defendant "twice in jeopardy" was designed to prevent repeated prosecutions for the same offense and what is often the concomitant imposition of heavy personal strain on the defendant. United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 27 L.Ed. 2d 543 (1971); Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Jeopardy attaches when a criminal trial commences before either a judge or jury, and in the present case Gibson was clearly put in jeopardy when his first trial began on April 13, 1970. The double jeopardy rule is not a rigid one, however, and there are situations where retrials are constitutionally permissible even though the first jury was discharged without giving any verdict and without the defendant's consent. A common example of this is when a jury is discharged because it is unable to reach a verdict. Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892).

As was pointed out this term by the Supreme Court, Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), the landmark decision construing the Double Jeopardy Clause in the context of a declaration of mistrial over a defendant's objection is United States v. Perez, 9 Wheat (22 U.S.) 579, 6 L.Ed. 165 (1824). In that case, the Court held that a defendant could be tried a second time after the judge, over the defendant's objection, excused a jury which had reported that it could not agree upon either acquittal or conviction. In his opinion, Mr. Justice Story expressed the following thoughts about what standards should determine whether or not a defendant can be reprosecuted when his first trial ends in a mistrial without his consent:

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, *taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.* They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." Id. at 580. (Emphasis added).

This language from *Perez* has formed the basis of all later Supreme Court decisions on double jeopardy in situations where the defendant did not consent to a mistrial, and it was recently quoted with approval in United States v. Jorn, *supra* 400 U.S. at 485–486, 91 S.Ct. at 557, after which Mr. Justice Harlan commented as follows:

> ". . . [T]he *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.
>
> . . .
>
> ". . . [T]hat discretion must still be exercised; unquestionably an important factor to be considered is the need to hold litigants on both sides

to standards of responsible professional conduct in the clash of an adversary criminal process. Yet we cannot evolve rules based on the source of the particular problem giving rise to a question whether a mistrial should or should not be declared, because, even in circumstances where the problem reflects error on the part of one counsel or the other, the trial judge must still take care to assure himself that the situation warrants action on his part foreclosing the defendant from a potentially favorable judgment by the tribunal.

". . . [I]n the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."

■ Applying the standards of "manifest necessity" and "public justice" to the facts in this case, we believe that the trial judge did not abuse his discretion in declaring a mistrial over the defendant's objection after he learned that a key prosecution witness, Captain Wilson, had become ill during the trial and could not testify. As Mr. Justice Black noted in Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."

In affirming the denial of a writ of habeas corpus, we reject appellant's assertion that the district court could not find from the record that Captain Wilson was a key prosecution witness. In support of this argument, appellant claims (a) that Captain Wilson's testimony as to Gibson's confession was unnecessary because it would merely have been cumulative to the testimony already given by Sergeant Tomasello and Moses Murray, and (b) that even if that confession constituted important addi-tional information, it could have been entered into evidence by Chief Nappen who was present when the confession was made. Neither of these contentions is persuasive.

■ With respect to appellant's first point, we simply cannot agree that the signed confession taken by Captain Wilson was no more than cumulative to the testimony of Sergeant Tomasello and Moses Murray. In that confession Gibson allegedly said, ". . . I went crazy and I took the knife away from her to defend myself . . . I don't know which one [the decedent or Murray] *I cut first*. I went blank then . . ." (emphasis added). While the testimony of Sergeant Tomasello and Moses Murray was significant, there can be no doubt that Gibson's confession, if believed by a jury, would be the most important element in the prosecution's case. Consequently, appellant's first point is without merit.

Appellant's second contention, that Captain Wilson was not a key witness because Chief Nappen could have introduced Gibson's confession, is also unfounded. Chief Nappen testified that when he came into the interrogation room Captain Wilson told him that "he had already talked to [Gibson] and given him his [*Miranda*] rights" and that Gibson was ready to make a statement. Since Chief Nappen did not hear Captain Wilson advise Gibson of his rights, any testimony by Nappen about these *Miranda* warnings would have been hearsay and a verdict in favor of the prosecution could have been upset at will by Gibson. Under these circumstances, Captain Wilson's testimony was essential and his sudden illness justified the declaration of a mistrial. *See* Illinois v. Somerville, *supra*. On this appeal, Gibson's attorney states that appellant would have been willing to concede that he had received proper *Miranda* warnings. However, appellant's counsel did not say this when he argued against the mistrial motion at the first trial, and we do not believe that the trial judge had an obligation to explore this unlikely

possibility on his own initiative before declaring a mistrial.

### III

■ Appellant's next contention is that an *ex parte* conference between the trial judge and the prosecutor on the day that the mistrial was granted indicates that the trial judge discharged the jury in order to give the prosecution the advantage of a second trial. Appellant presents no evidence on this point, however, and in its absence we are unwilling to accept his inference of misconduct. Such an *ex parte* conference may have been ill-advised, but there is nothing on the record to show that it prejudiced appellant.

### IV

■ Appellant's final argument is that certain questions which he was repeatedly asked during cross-examination in his second trial were improper and violated his Fifth Amendment right against compulsory self-incrimination. Since this claim was not made before the district court, appellant is precluded from raising it here.

The judgment of the district court denying the writ of habeas corpus will be affirmed.