# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00221-SCT

*ADRIAN MONTGOMERY a/k/a ADRIAN
DANIELLE MONTGOMERY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2016 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | ALICE THERESA STAMPS |
| | KIMALON S. CAMPBELL |
| | GRETA D. MACK HARRIS |
| | ADOFO MINKA |
| | SHAUNTE' DENISE WASHINGTON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., MAXWELL AND ISHEE, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     On August 6, 2013, Adrian Montgomery and Terome O'Neal were drinking beer and

liquor and smoking marijuana in a park. An eyewitness saw O'Neal knock Montgomery's

joint to the ground. This prompted Montgomery to angrily attack O'Neal. Paramedics found

O'Neal on the ground unconscious. He died days later in the hospital of multiple blunt-force trauma. Montgomery was indicted for deliberate-design murder but convicted on the lesser-included crime of depraved-heart murder.

¶2. Montgomery's first trial resulted in a mistrial. The judge granted a mistrial when the State learned—after the jury had been empaneled—that the medical examiner who had conducted O'Neal's autopsy had a sudden family emergency, rendering him unavailable. Montgomery argues his second trial placed him in double jeopardy because there had been no manifest necessity for the mistrial. We disagree. The cause of O'Neal's death was the main contested issue. Thus, the medical examiner was a key witness whose unavailability was unanticipated by the State. And due to the unknown and open-ended nature of the emergency, a continuance did not appear to be a reasonable option. So there was manifest necessity to declare a mistrial.

¶3. Montgomery alternatively argues for the first time on appeal that one of the depraved-heart-murder instructions was fatally defective because it omitted the phrase "without authority of law." But other instructions made clear that to find Montgomery guilty of murdering O'Neal, the killing could not be "justifiable" self-defense or an "excusable" accident. Thus, when read as a whole, the depraved-heart-murder instructions were clear that the killing had to be unlawful.

¶4. We affirm Montgomery's second-degree-murder conviction and sentence.

**Background Facts and Procedural History**

**I.    Mistrial**

2

¶5. Montgomery's first murder trial began on Monday, October 3, 2016. Pretrial motions and jury selection took up the entire first day.

¶6. One issue that emerged in pretrial motions was the importance of expert testimony concerning O'Neal's cause and manner of death. The State had filed a motion in limine to exclude Montgomery's expert pathologist, Dr. Stephen Hayne. The exclusion was sought because Dr. Hayne had been designated too late and planned to offer a legal opinion outside his area of expertise. Montgomery's counsel disagreed. She countered that, because "the State has their expert, Dr. J. Brent Davis, testifying as to the cause of death," Montgomery had the right to present his own expert, Dr. Hayne. She insisted "the jury is entitled to hear his opinion as well as the State's pathologist's opinion and decide between the two which one they believe" concerning O'Neal's cause of death. Instead of addressing the issue before trial, the court reserved his ruling on whether Dr. Hayne would be permitted to testify.

¶7. Following pretrial motions, the jury was selected and sworn. The jury then was sent home for the day.

¶8. The next day, as soon as trial began, the State alerted the court it had "an issue with the medical examiner," Dr. Davis. The State had just learned a few minutes earlier, through an assistant with the State Medical Examiner's Office, that Dr. Davis's father-in-law had been placed in hospice care the evening before. So Dr. Davis could not attend court to testify that day. Because the jury had already been empaneled, the State requested a mistrial or a continuance.

¶9. The court asked, if it were it to grant a continuance, would Dr. Davis be available to testify the next day. The prosecutor was unsure. The only thing she had been told was that Dr. Davis was with his father-in-law. And it was uncertain how much longer his father-in-law would live. The prosecutor then requested a brief recess to try to gain more information about Dr. Davis's situation.

¶10. The court ordered a recess so the prosecutor could try to locate Dr. Davis and determine if he would be available to testify in a day or two. But the State was unable to contact him or determine his whereabouts. After the recess, the prosecutor informed the judge that the assistant she had spoken with had been unable to contact Dr. Davis or any of the other doctors in the Medical Examiner's Office. While the judge and the prosecutor speculated Davis was probably somewhere in the Jackson metro area, the assistant was unsure where Dr. Davis was or when he would return. All she knew was that he had a family emergency.

¶11. With a continuance seeming an unlikely option, Montgomery's counsel lodged an objection to the State's alternative request for a mistrial. Citing double jeopardy, she asked the judge to dismiss the charge against Montgomery. The State pointed out the incident leading to Dr. Davis's unavailability was unforseen and that Dr. Davis was a material witness. Agreeing with the State, the trial court granted a mistrial "due to the fact that the witness is obviously not available."

¶12. Trial was reset for November 7. During the pretrial motions, Montgomery once again moved to dismiss, claiming his double-jeopardy protection would be violated by a second

4

trial. Montgomery argued there had been no manifest necessity to declare a mistrial the month before. Instead, his counsel likened the situation to that in ***Downum v. United States***, 372 U.S. 734, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963), in which the government simply failed to secure a material witness before trial started.[1]

¶13.   The State disagreed. It maintained there had been manifest necessity based on Dr. Davis's sudden family emergency and the fact he was a necessary witness for the State. Further, Dr. Davis was the only forensic pathologist to sign O'Neal's autopsy report, so an alternate medical examiner could not testify about the cause of death.

¶14.   The court denied Montgomery's second motion to dismiss. The court reiterated that it had granted a mistrial based on Dr. Davis's family emergency. And if the mistrial had not been granted, the jury would have had to wait days without trial testimony. And this waiting game "would have been inappropriate."

## II.    Second Trial

¶15.   The State's first witness at the second trial was Charles Brownlow. Brownlow had been with Montgomery, O'Neal, and several other men on July 6, 2013. The group had been drinking beer and liquor and smoking marijuana under a big oak tree in Pointdexter Park near downtown Jackson. According to Brownlow, Montgomery was smoking weed and became angry when O'Neal knocked the drugs out of Montgomery's hand. The two got into a fight. As Brownlow put it, "there was a few words said, and then all I heard was like a hit, and then

---

[1] Montgomery based this argument on the assertion that the State had failed to subpoena Dr. Davis. But the record shows the State *had* subpoenaed Dr. Davis. So his failure to appear was not due to the State's lack of diligence but rather Dr. Davis's sudden family emergency.

the next thing the old man . . . was on the floor." Brownlow guessed Montgomery had hit O'Neal. Because the tree obscured his view, Brownlow did not actually see the blow, but he did see the end result—O'Neal lying on the ground unconscious with blood flowing from his mouth. While everyone else in the group scattered, Brownlow stayed with O'Neal until paramedics arrived.

¶16. O'Neal was taken to the University of Mississippi Medical Center. He died three days later, after his family removed him from life support. O'Neal's mother, Catherine O'Neal Moore, testified about learning her son was in the hospital and having to remove him from life support. And the police detective and the crime-scene investigator testified about the criminal investigation resulting in Montgomery's murder indictment.[2]

¶17. Dr. Davis then testified. Dr. Davis performed the autopsy on O'Neal's body. He found multiple injuries, "predominantly [to] the face and head, including bruising on the face." There were tears in the scalp, skull fractures, bruises on the brain, and bleeding in the brain. Dr. Davis determined the cause of death was "multiple blunt-force trauma" and the manner of death homicide. While O'Neal had significant natural diseases, blunt-force trauma, and not disease, caused his death. On cross-examination, Dr. Davis rejected that the trauma could have been caused by falling on a tree root. In his expert opinion, O'Neal's death was not the result of an accidental fall.

---

[2] Specifically, now-Sergeant Obie Wells testified about his recorded interviews with Brownlow and Montgomery, respectively. While the jury heard Montogmery's recorded confession, the CD audio recording was retained by the trial court and is not part of the record on appeal.

¶18. The sole defense witness was Dr. Hayne, who was admitted as an expert forensic pathologist over the State's objection. According to Dr. Hayne, O'Neal's medical records revealed he had a disease that weakened his face and skull bones. Also, the toxicology report showed O'Neal had been impaired when he was injured. He testified O'Neal's injury to his face could have been caused by falling and striking a tree root. In his expert opinion, the cause of death was "cranial facial trauma and fractures and injuries to the brain." He believed these injuries were caused by either a "simply injury from a fall or a combination of three blows to the face with a fall."

¶19. At the close of trial, the State requested an instruction on the lesser-included offense of depraved-heart murder. And the defense sought a heat-of-passion-manslaughter instruction. Given the option of deliberate-design murder, depraved-heart murder, heat-of-passion manslaughter, or not guilty, the jury found Montgomery guilty of depraved-heart murder. *See* Miss. Code Ann. § 97-3-19(1)(b) (Supp. 2017). He was sentenced to twenty-five years' imprisonment, with five years suspended, five years' probation, and twenty years to serve. *See* Miss. Code Ann. § 97-3-21(2) (Rev. 2014).

### III. Appeal

¶20. Montgomery appeals his conviction. Represented by new counsel on appeal, he asserts three errors:

(1) The second trial violated his right against double jeopardy.

(2) The depraved-heart murder instruction omitted an essential element.

(3) The lack of a complete trial record violates his statutory right to an appeal and is a denial of due process.

7

**Discussion**

### I. Double Jeopardy

¶21. Montgomery first argues his second trial violated the constitutional protection against double jeopardy, because there had been no manifest necessity to declare a mistrial in his first trial.

### A. *Manifest-Necessity Requirement*

¶22. Among its protections, the Fifth Amendment of the United States Constitution prohibits the State from putting a defendant in jeopardy twice for the same offense. *Arizona v. Washington*, 434 U.S. 497, 503, 98 S. Ct. 824, 829, 54 L. Ed. 2d 717 (1978) (citing *Benton v. Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)). The Mississippi Constitution also provides that "[n]o person's life or liberty shall be twice placed in jeopardy for the same offense; but there must be an actual acquittal or conviction on the merits to bar another prosecution." Miss. Const. art. 3, § 22. But the federal constitutional right is broader, attaching "[e]ven if the first trial is not completed[.]" *Washington*, 434 U.S. at 503-04. In *Jones*, this Court recognized that the Fifth Amendment protection against "double jeopardy attaches in any criminal proceeding [in Mississippi] at the moment the trial jury is selected and sworn to try the case." *Jones v. State*, 398 So. 2d 1312, 1314 (Miss. 1981).

¶23. However, discharging the jury before trial is complete does not always lead to a double-jeopardy bar. "Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not

8

invariably create unfairness to the accused, [a criminal defendant's] valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Washington*, 434 U.S. at 505. "Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor . . . must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant" if he is to avoid the double-jeopardy bar. *Id.*

¶24. As this Court has framed it, "no retrial for the same offense will be permitted in any criminal case in which the first trial, following the swearing and impaneling of the jury, was aborted prior to conclusion, unless exceptional circumstances existed in the first case, and there was a manifest necessity for the trial judge to declare a mistrial." *Jones*, 398 So. 2d at 1314. At Montgomery's first trial, the jury had been selected, sworn, and empaneled. So jeopardy had attached. This meant that Montgomery could not be retried unless there was a manifest necessity to declare a mistrial.

¶25. The amount of discretion a trial court has to find manifest necessity turns on the *reason* for mistrial. For example, a trial court's decision that a juror is biased or a jury is hopelessly deadlocked is entitled to "broad deference." *United States v. Fisher*, 624 F.3d 713, 718 (5th Cir. 2010) (citing *Washington*, 434 U.S. at 513-14). But a mistrial based on "the unavailability of critical prosecution evidence" must survive the "strictest scrutiny." *Id.*

9

(quoting *Washington*, 434 U.S. at 508). Here, the trial court declared a mistrial based on the unavailability of a key State witness, so the strictest scrutiny applies.[3]

### B.     Trial Court's Reason for Mistrial

¶26.    From the outset, we pause to address Justice King's dissenting view that the trial court based its decision to declare a mistrial, not on Dr. Davis's unavailability, but rather simply because testimony had not begun and Montgomery could not show prejudice.

¶27.    In *Jones*, this Court expressed that the "prudent procedure for any trial court before declaring a mistrial would be to state into the record the reasons for declaring a mistrial." *Jones*, 398 So. 2d at 1318-19. Here, the trial judge followed our advice, clearly stating for the record at the time mistrial was granted: "The court wants this matter to proceed but, however, *due to the fact that the witness is obviously not available*, the court will declare a mistrial."[4] (Emphasis added.) So contrary to the dissent's view, it was the State's showing its key witness was unavailable, and not Montgomery's inability to show prejudice, that drove the trial court's decision.

¶28.    While, at this juncture, the trial judge did not explicitly state there was "manifest necessity" to declare a mistrial, he was not required to do so. *Washington*, 434 U.S. at

---

[3] According to the Fifth Circuit, "strictest scrutiny" requires the trial court to conduct "[a] painstaking examination of all relevant facts and circumstances," which must "encompass[] at least a careful consideration of any reasonable alternative to a mistrial." *Fisher*, 624 F.3d at 722.

[4] As the dissent points out, the language in the ensuing order misstated the reason for declaring mistrial. But it is obvious the court used a form order with boilerplate language. And not even the dissent is arguing that the reason stated in the form order was the actual reason a mistrial was granted.

10

516-17. Nor was he required to "expressly state that he considered alternatives and found none to be superior." **United States v. Bauman**, 887 F.2d 546, 550 n.8 (5th Cir. 1989) (citing **Washington**, 434 U.S. at 501). So, a month later, when the trial judge further explained how he had considered but rejected there being a reasonable alternative to mistrial and why he had found there was manifest necessity to declare a mistrial, the judge was not "cleaning up" a deficiency in his earlier ruling. Nor was he changing his reasoning. The record shows that both motions to dismiss were denied for the exact same reason—a mistrial was manifestly necessary based on Dr. Davis's sudden unavailability.

¶29. "It is in [the trial judge's] sound discretion to determine the necessity of declaring a mistrial, and upon any appeal his reasons as stated for the record will be accorded the greatest weight and respect by an appellate court." **Id.** at 1319. The trial judge determined a mistrial was manifestly necessary due to Dr. Davis's absence. Instead of disregarding and wholly dismissing the trial judge's reason as the dissent does, we accord this reason the great weight and respect that the law requires, as we decide if the trial court's declaring a mistrial based on Dr. Davis's unavailability survives strictest scrutiny.

### C. Dr. Davis's Unvailability

¶30. The United States Supreme Court has "refuse[d] to say that the absence of witnesses 'can never justify discontinuance of a trial.'" **Downum**, 372 U.S. at 737 (quoting **Wade v. Hunter**, 336 U.S. 684, 691, 69 S. Ct. 834, 838, 93 L. Ed. 974 (1949)). Instead, "[e]ach case must turn on its facts." **Id.** That said, when surveying cases across jurisdictions that have found a prosecution witness's unavailability created a manifest necessity to declare a mistrial,

11

a pattern does emerge. A manifest-necessity finding tends to be upheld when the witness's availability was sudden and unknown to the prosecution before trial began and jeopardy attached, the witness was a key prosecution witness, and the trial court considered alternatives to declaring a mistrial but none appeared adequate. *See, e.g.*, *United States ex rel. Gibson v. Ziegele*, 479 F.2d 773, 777 (3d Cir. 1973); *Wilson v. Gusman*, 2012 WL 893471, at **5-6 (E.D. La. March 15, 2012) (unreported); *McCorkle v. State*, 619 A.2d 186, 201 (Md. Ct. App. 1993).[5]

¶31.  The facts here follow that pattern. First, Dr. Davis's unavailability was sudden and surprising to the State. This case is not like *Downum*, in which the prosecution simply "took a chance" and "allowed the jury to be selected and sworn even though one of its key

_____

[5] In *Ziegele*, the Third Circuit held the trial court did not abuse its discretion in declaring a mistrial over the defendant's objection when it learned the key prosecution witness—the officer who recorded the defendant's confession—had suffered a "cardiac insufficiency" and would not be able to testify for several weeks, making a continuance infeasible. *Ziegele*, 479 F.2d at 777. In *Wilson*, the district court found there had been manifest necessity for the trial court to declare a mistrial when the alleged rape victim, "obviously an essential witness," discovered her pregnancy was ectopic and required emergency surgery and an uncertain period of recovery, making it unfair for the jury that had been sworn "to have this case hanging over their heads for some indeterminate number of days." *Wilson*, 2012 WL 893471, at **5-6. And in *McCorkle*, the state appeals court held that manifest necessity existed for the trial court to declare a mistrial based on a witness's sudden illness because "the witness who was absent was the key prosecution witness," "the key witness's absence was not known to or reasonably expected by the State prior to jeopardy attaching," and the "trial judge considered alternatives to declaring mistrial, but . . . none of these alternatives appeared efficacious." *McCorkle*, 619 A.2d at 201.

By contrast, reviewing courts have found no manifest necessity to declare a mistrial when: the prosecutor, prior to trial beginning, had reason to suspect that the witness may not appear, *e.g.*, *Downum*, 372 U.S. at 735-37, and *United States v. Stevens*, 177 F.3d 579 (6th Cir. 1999); the unavailable witness's testimony was not essential, *e.g.*, *Routh v. United States*, 482 A.2d 638 (D.C. Ct. App. 1984); or the trial court too hastily declared a mistrial before considering alternatives, *e.g.*, *United States v. Rivera*, 384 F.3d 49, 56 (3d Cir. 2004).

witnesses was absent and had not been found." ***Downum***, 372 U.S. at 735-37. Here, Dr. Davis had been prepared to testify when trial began. The record reflects the State had subpoenaed Dr. Davis to appear for trial beginning that Monday. So when jury selection started on Monday, October 3, the State had no reason to anticipate that its expert pathologist would be unavailable to testify that week. And it was only the next morning that someone in Dr. Davis's office called to alert the prosecution that Dr. Davis had a family emergency that would prevent him from coming to court.[6] *See* ***Ziegele***, 479 F.2d at 775 (holding that, since the lead investigative officer "had been present on the first day of the trial, it is evident that he would have been available as a witness if he had not become ill").[7]

¶32. Second, Dr. Davis was a key witness. Just the day before Dr. Davis became unavailable, during the pretrial motion to exclude Dr. Hayne, both sides teed up this case as largely a battle of experts on O'Neal's cause and manner of death. So when the trial judge

---

[6] The dissent questions whether Dr. Davis had a true "emergency," as defined by Black's Law Dictionary. Citing a completely irrelevant regulatory statute, the dissent suggests Dr. Davis's father-in-law's situation was not urgent enough to render Dr. Davis suddenly unavailable. This suggestion not only ignores the record—the State was told Dr. Davis was "with his father in law" because "he doesn't know how much longer he has to live"—it also misses the point. The relevant inquiry is not whether being placed in "hospice," as that term is defined for licensing purposes, constitutes an emergency. Instead, the real question is whether Dr. Davis's absence was "known to or reasonably expected *by the State* prior to jeopardy attaching." ***McCorkle***, 619 A.2d at 61 (emphasis added). Indeed, in ***McCorkle***, it appears there was no real "emergency" after all because the government's key witness had lied to the court about being sick to get out of testifying. But that did not change the critical fact that the witness's absence came as a surprise to the State. Given that the State had subpoenaed Dr. Davis, the record supports that his absence was sudden and certainly unanticipated by the State.

[7] The only difference between ***Ziegele*** and this case is that, here, it was Dr. Davis's father-in-law, and not Dr. Davis himself, who became gravely ill. But the result is the same. Dr. Davis's unexpected family emergency rendered him unavailable to testify.

learned of Dr. Davis's sudden unavailability the next day, the court was well aware that Dr. Davis's testimony about O'Neal's cause of death was crucial to the State's case. *See Ziegele*, 479 F.2d at 777 (finding the unavailable officer's testimony about the defendant's confession was "the most important element in the prosecution's case"); *Wilson*, 2012 WL 893471, at *5 (noting the unavailable alleged rape victim was "obviously an essential witness"); *McCorkle*, 619 A.2d at 201 (noting the missing witness was key, with "both parties ha[ving] made extensive references to this witness's expected testimony" during their opening statements).

¶33. That leaves only the question of whether the trial court adequately considered the alternatives to declaring a mistrial. *See Fisher*, 624 F.3d at 722 (defining "strictest scrutiny" to include requiring the trial court to conduct "a careful consideration of any reasonable alternative to a mistrial"). And here is where Montgomery focuses his no-manifest-necessity argument on appeal. He asserts the trial judge declared a mistrial without enough information. He points out that neither the prosecutor nor the judge spoke with Dr. Davis directly, no one represented Dr. Davis himself was too incapacitated to testify, and it was not known whether a one- or two-day continuance would have resolved the problem.

¶34. It was the very lack of said information, however, that led the trial court to believe its only choice was to declare a mistrial. The trial judge in this case did the exact same thing the judge in *Ziegele* did—he granted a recess to better ascertain the witness's situation to determine if a continuance was possible. *Ziegele*, 479 F.2d at 775. The judge directed the State to call the Medical Examiner's Office to find out if Dr. Davis was somewhere in the

14

area and whether he would be available in the next few days, making a continuance feasible. Unfortunately, the State was unable to get any answers. The only thing Dr. Davis's assistant knew was that Dr. Davis was somewhere with his dying father-in-law.

¶35.    Montgomery contends a day or two continuance *could* have resolved the problem. But his argument is speculative. A day or two continuance could have resulted in the same situation—Dr. Davis still unavailable to testify due to his family emergency.[8] In the trial court's view, asking the jury to wait an unknown duration without trial testimony would have been inappropriate. The trial court in *McCorkle* reached a similar conclusion when considering a continuance until the State could secure the witness, who was suspected of faking his illness. In the court's view, there was "no reasonable likelihood the witness was going to appear." So "it would [have been] burdensome and unfair to the jurors to have this matter linger and them not knowing when the day of trial would be." *McCorckle*, 619 A.2d at 191. *See Wilson*, 2012 WL 893471, at *2 (noting the trial court had rejected the alternative of a continuance because it was "unfair to the jury that's been sworn to have this case hanging over their heads for some indeterminate number of days").

---

[8] The same is true for the dissent's suggestion that waiting a few more hours might have resulted in the State being able to contact Dr. Davis. The message Dr. Davis had communicated to the State through his office was that he would be out of reach while his father-in-law was dying—a situation that was unlikely to change in a few hours.

15

¶36. The trial judge considered the alternative to mistrial—a continuance.[9] But given the open-ended nature of Dr. Davis's unavailability—being with a dying family member—the trial court found a continuance was not an appropriate alternative. Therefore, under the circumstances, which included Dr. Davis's unexpected family emergency, the importance of his testimony, and the uncertainty that a continuance would suffice—we hold manifest necessity existed to declare a mistrial. So Montgomery's "valued right to have the trial concluded" by the first tribunal, in this case, was "subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Washington*, 434 U.S. at 505. And his second trial did not violate double jeopardy.

## II. Jury Instructions

¶37. Alternatively, Montgomery argues he is entitled to a new trial because Instruction 15—a jury instruction for the lesser-included charge he was convicted of—was fatally defective. According to Montgomery, this instruction lacked the essential element that the killing must be "without authority of law."

¶38. Submitted as S-2A, Jury Instruction 15 instructed the jury:

> If you believe from all the evidence, beyond a reasonable doubt, that:
>
> (1) The defendant, Adrian Montgomery;
>
> (2) did, on or about the 6th day of July, 2013, in the First Judicial District of Hinds County, Mississippi;

---

[9] As the Fifth Circuit has noted, "Manifest necessity does not mean *absolute* necessity[.]" *Fisher*, 624 F.3d at 718 (emphasis added). So what it required is that the trial court consider "reasonable alternatives." *Id.* at 721. And the dissent's proposed alternative that the trial court could have tracked Dr. Davis down and sent an officer to forcibly remove him from his father-in-law's hospice bed does not strike this Court as reasonable.

(3) kill Terome O'Neal, a human being, by beating the said Terome O'Neal with his fist;

(4) while in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;

(5) and not in necessary self-defense;

then and in that event, you must find the defendant, Adrian Montgomery, guilty of Depraved Heart Murder.[10]

Montgomery zeroes in on the fact that this particular instruction did not contain the phrase "without authority of law." He insists this omission was prejudicial because his theories of defense were self-defense and accident, both of which would have excused the killing. Moreover, because both the deliberate-design-murder instruction and the heat-of-passion-manslaughter instruction contained this phrase, he suggests the omission in Instruction 15 gave the jury the option to find him guilty of depraved-heart murder, even if his killing O'Neal had been lawful.

¶39.   Montgomery did not object to Jury Instruction 15 as given to the  jury. While Montgomery did object to the instruction's original inclusion of the phrase "or blunt object," the trial judge agreed to remove this language. He then asked Montgomery's counsel if she had any further objections to Instruction 15, to which Montgomery's counsel replied "no." On appeal, Montgomery "may not argue that an instruction was erroneous for a reason other than the reason assigned on objection to the instruction at trial." *Irby v. State*, 893 So. 2d

---

[10] The instruction continued: "If the prosecution has failed to prove any one or more of the above listed elements of Murder or Depraved Heart Murder beyond a reasonable doubt, then you shall find the Defendant not guilty of Depraved Heart Murder."

17

1042, 1047 (Miss. 2004). For this same reason, the objection Presiding Justice Kitchens relies on certainly did not preserve Montgomery's claim. That objection was to a *different* instruction, Instruction 12, for a *different* reason.[11]

¶40. As we have held, "when a jury instruction is offered at trial, it is the duty of the opposing party, in order to preserve the point for appeal, to state a contemporaneous objection in specific terms." *Id.* (citations omitted). Here, Montgomery did not specifically object to Instruction 15 because it lacked the phrase "without authority of law." Nor did he raise any concern that the depraved-heart-murder instructions as a whole were missing this essential element. So this issue is waived. And our review is limited to plain error. *Shinstock v. State*, 220 So. 3d 967, 970 (Miss. 2017).

¶41. "Under the plain-error doctrine," this Court "can recognize obvious error which was not properly raised by the defendant and which affects a defendant's 'fundamental, substantive right.'" *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012) (quoting *Smith v.*

---

[11] Instruction 12, submitted as S-4, defined "acting with a depraved heart." It provided:

> The Court instructs the Jury acting with a depraved heart is when a person acts in a highly dangerous way which shows that the person does not care for the safety of human life. Even if someone does not intend to kill any particular person, he can still be guilty of murder if he acts with a depraved heart, [and] a person is killed as a result.

Montgomery objected to Instruction 12 because this particular instruction, which dealt with the depraved-heart element of second-degree murder, did not "not track the language of the statute" and was not supported by the evidence. Montgomery does not reassert these claims on appeal. And these objections cannot be conflated with the objection Montgomery raises for the first time on appeal—that the instructions are fatally defective because they are missing the "without authority of law" element." *Irby*, 893 So. 2d at 1047.

18

*State*, 986 So. 2d 290, 294 (Miss. 2008)). The failure to submit to the jury the essential elements of the crime is a "fundamental error." *Hunter v. State*, 684 So. 2d 625, 636 (Miss. 1996) (citing *Screws v. United States*, 325 U.S. 91, 107, 65 S. Ct. 1031, 1038, 89 L. Ed. 1495 (1945)). However, when a jury instruction is challenged on appeal, this Court does not review it in isolation. *Rubenstein v. State*, 941 So. 2d 735, 787 (Miss. 2006). Instead, this Court reads the instructions "as a whole to determine if the jury was properly instructed." *Id.* (quoting *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001)). If the jury instructions, read as a whole, fairly announce the law of the case and create no injustice, no reversible error will be found. *Harris v. State*, 861 So. 2d 1003, 1014 (Miss. 2003).

¶42. When the deliberate-design-murder instructions are read as a whole, we discern no obvious error. The essential elements of depraved-heart, or "second-degree," murder are "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" Miss. Code Ann. § 97-3-19(1)(b).

¶43. But the three instructions immediately following Instruction 15 alleviate any concern that the jury may have mistakenly believed it could find Montgomery guilty for *lawfully* killing O'Neal. Instructions 16, 17, and 18 clearly instructed the jury on Montgomery's two defense theories. Specifically, the jury was instructed that O'Neal's killing would be "justified" if done in self-defense and "excusable" if the result of an accident.[12] Stated

---

[12] Instruction 16 informed the jury:

differently, the jury was instructed that, to find Montgomery guilty of depraved-heart murder,

it had to find that Montgomery not only killed O'Neal but also that Montgomery's actions

were neither "justified" nor "excusable." So, contrary to Montgomery's suggestion, the jury

---

> The Court instructs the jury that a person is under no duty to retreat and avoid the necessity of using deadly force where otherwise a homicide is committed in self defense.

> If you find from the evidence that the killing of Terome O'Neal is justified and that Adrian Montgomery acted in self-defense because he had reasonable grounds to fear that he would suffer great personal injury and that there was imminent danger of the injury occurring, then Adrian Montgomery would have no duty to retreat, whether he could have done so with complete safety or not.

Instruction 17 continued:

> The Court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to Adrian Montgomery must be either actual, present, and urgent, or Adrian Montgomery must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts.

> If you the jury find that Adrian Montgomery acted in self-defense, then you must find the defendant not guilty.

And Instruction 18 read:

> The Court instructs the jury that the killing of a human being is excusable homicide if you find from the evidence, if any, that Adrian Montgomery's act which caused the death of Terome O'Neal was the result of an accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, and if you further find that Terome O'Neal's death was caused by an accident resulting from Adrian Montgomery hitting Terome O'Neal and Terome O'Neal's head hitting a tree.

20

was not erroneously instructed it could find Montgomery guilty of murder for lawfully killing O'Neal.

¶44.   Instead, this case is akin to ***Harris v. State***.  There, the defendant similarly claimed the giving of a depraved-heart-murder instruction that omitted the phrase "without authority of law" was error.  ***Harris***, 861 So. 2d at 1013.  But this Court summarily rejected that argument, holding synonymous "unlawful" language in a different part of the instruction was an "acceptable substitute" for the missing phrase.  ***Id.***   The same was true in ***Ramsey v. State***, 959 So. 2d 15, 22 (Miss. Ct. App. 2006).  Though the capital-murder instruction did not include the "relevant language 'without authority of law'"—or even the synonym "unlawful"— the Court of Appeals found no error based "upon reading the instruction in its entirety and considering the language of the instruction as a whole."  ***Id.***

¶45.   Because the depraved-heart-murder instructions, when read as a whole, "fairly announce the law of the case and create no injustice," no plain error occurred.  ***Harris***, 861 So. 2d at 1014.

### III.    Trial Record

¶46.   Finally, Montgomery claims his right to appeal has been impeded because none of the bench conferences were recorded by the court reporter.  But in ***Keller v. State***, a death-penalty case, we held a similar claim had "not been properly preserved for appeal due to the absence of a contemporaneous objection by the defendant at trial to failure on the part of the court reporter to record all of the proceedings."  ***Keller v. State***, 138 So. 3d 817, 836 (Miss. 2014).   Here, instead of an objection, Montgomery's counsel *agreed* that the bench

21

conferences would be off-the-record. Thus, this issue was not properly preserved for appeal.[13]

## Conclusion

¶47. Because there was manifest necessity for a mistrial of Montgomery's first trial, and because the depraved-heart-murder instructions, when read as a whole, fairly announced the law, we find no error. We affirm Montgomery's second-degree-murder conviction and sentence.

¶48. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND COLEMAN, JJ. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND COLEMAN, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶49. I wholeheartedly join the thorough and well-written dissent of my learned colleague Justice King. I write separately because, even in the absence of the double jeopardy problem, the majority erroneously excuses another fatal defect in the jury instructions.

¶50. The majority incorrectly applies the plain error standard and finds that "Montgomery did not object at trial to [the depraved-heart murder instruction] as given to the jury." Maj. Op. ¶ 39. Defense counsel did object to the instruction defining "acting with a depraved

---

[13] Montgomery's appellate counsel suggests the agreement to allow all bench conferences to be off-the-record constituted constitutionally ineffective assistance of trial counsel. But she concedes the record is not sufficiently developed to address ineffective assistance on direct appeal. We agree an ineffective-assistance claim would be better suited for a petition for postconviction relief. So to the extent Montgomery has brought such a claim, we dismiss it without prejudice. *See Archer v. State*, 986 So. 2d 951, 956-57 (Miss. 2008).

22

heart," Instruction S-4, arguing that it "does not track the language of the statute . . . ." Defense counsel's recitation of Mississippi Code Section 97-3-19(1)(b) included the "without the authority of law" language. Defense counsel then, a second time, stated that the jury instruction "doesn't track the language of the statute."

¶51. Instruction S-4, to which defense counsel objected, stated the following:

> The Court instructs the Jury acting with a depraved heart is when a person acts in a highly dangerous way which shows that the person does not care for the safety of human life. Even if someone does not intend to kill any particular person, he can still be guilty of murder if he acts with a depraved heart, a person is killed a result.

At the outset, "the above instruction is an abstract instruction on the law and should not be given." *Wall v. State*, 379 So. 2d 529, 532 (Miss. 1980) (citations omitted) (holding that an instruction which explained to the jury that "'proof of motive is not essential to a conviction for felonious homicide'" was defective because it "was prejudicial to the appellant and well could have confused the jury into returning a guilty verdict after having been told by the court that motive was not required to be shown").

¶52. Despite Wall's having made no objection to the infirm instruction, the Court reversed and remanded the case *sua sponte*: "[I]n extreme cases, this Court may raise an objection to a jury instruction in order to prevent manifest injustice." *Id.*

¶53. Instruction S-4, standing alone and in the absence of a specific objection, warrants reversal. Counsel's objections to Instruction S-4, the instruction defining "acting with a depraved heart," sufficiently preserved Montgomery's claim on appeal that the depraved heart murder instruction, Instruction S-2A, was fatally defective for failure to fully to instruct

23

the jury on the elements of the depraved heart murder. And even if that objection was insufficient to preserve Montgomery's claim on appeal, such an extreme omission warrants intervention by this Court "in order to prevent manifest injustice." *Id.*

¶54.  Mississippi Code Section 97-3-19(1)(b) (Rev. 2014) states that "[t]he killing of a human being *without the authority of law* by any means or in any manner" shall be second-degree murder "[w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . ." Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014) (emphasis added).

¶55.  Instruction S-2A informed the jury that:

[I]f you believe from all the evidence, beyond a reasonable doubt, that:

(1)     The defendant, Adrian Montgomery;

(2)     [D]id, on or about the 6th day of July, 2013, in the First Judicial District of Hinds County, Mississippi;

(3)     [K]ill Terome O'Neal, a human being by beating the said Terome O'Neal with his fists . . .

(4)     While in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;

(5)     And not in necessary self-defense;

[T]hen and in that event, you must find defendant, Adrian Montgomery, guilty of Depraved Heart Murder.

Notably absent from the depraved-heart jury instruction was the statutory language "without the authority of law." The phrase "without the authority of law" had been included in the jury

24

instruction on first-degree, deliberate-design murder, which the jury rejected; and Montgomery's indictment for first-degree, deliberate-design murder had alleged that Montgomery's killing of Terome O'Neal had been "without authority of law."

¶56.   This Court has held that "it is always and in every case reversible error for the courts of Mississippi to deny an accused the right to have a jury decide guilt as to each and every element." *Harrell v. State*, 134 So. 3d 266, 275 (Miss. 2014). The majority excuses the failure to instruct the jury that it had to find that Montgomery's actions had been "without the authority of law" on the basis of harmless error. It equates the jury's rejection of Montgomery's defense theories on self defense and accident, which had been presented to the jury in the form of separate instructions, with a finding, beyond a reasonable doubt, that Montgomery's actions had been "without the authority of law." But this Court recently held that harmless error analysis never can be applied to cases in which "the trial court fails to instruct a jury as to elements of a charged crime." *Harrell*, 134 So. 3d at 275, *overruling Kolberg v. State*, 829 So. 2d 29 (Miss. 2002).

¶57.   Merely because the jury rejected Montgomery's defense theories does not mean that it found, beyond a reasonable doubt, that Montgomery had killed O'Neal "without the authority of law." Accordingly, I respectfully dissent.

   **KING AND COLEMAN, JJ., JOIN THIS OPINION.**

   **KING, JUSTICE, DISSENTING:**

¶58.   The majority relies on a misconstruction of the record to conclude that manifest necessity for a mistrial existed.  Because manifest necessity for a mistrial was not shown,

because the trial court inappropriately flipped the burden of proof regarding the appropriateness of a mistrial to the defendant, and because the prohibition against double jeopardy barred the defendant's retrial, I respectfully dissent.

¶59. The majority relies heavily on the trial court's "finding" that "if the mistrial had not been granted, the jury would have had to wait days without trial testimony. And this waiting game 'would have been inappropriate'" to find that manifest necessity existed to grant a mistrial. Maj. ¶ 14. Yet, the trial court found no such thing in granting the mistrial, and nothing in the record indicates that the jury would have had to wait days without trial testimony. Moreover, when deciding whether to grant a mistrial, the trial court did not place the burden on the State to prove manifest necessity; rather, he inappropriately placed the burden on the defendant to prove prejudice.

¶60. When the trial court asked counsel if they were ready for opening statements, the State replied that the medical examiner's "father-in-law is in hospice - - was put in hospice late yesterday afternoon. We just found out about it really a couple of minutes ago." The State explained that it had spoken with the doctor's assistant, who said that he was with his father-in-law and did not know how much longer he had to live. The trial court queried how soon the doctor could get to court, and the State did not know. The State did represent that the doctor was in the Jackson metro area, as the case was being tried in Jackson. The trial court then granted a fifteen minute recess to allow the State to find out more information regarding the absence, and to determine how soon Dr. Davis could arrive at court. The State was unable to contact Dr. Davis directly and was unable to glean much more information than it

26

had at the outset of the day, just about twenty minutes before. The State, based on this scant information gleaned over a time period of only approximately twenty minutes, moved for a mistrial, stating in full: "Your Honor, based upon my understanding of what the law is, I'm going to have to - - since the jury has already been empaneled and sworn, I'm going to have to ask the court to declare a mistrial." The defense objected and moved for dismissal based on double jeopardy. The following exchange then occurred:

| | |
|---|---|
| THE COURT: | Okay. He'll be facing double jeopardy? |
| MS. STAMPS: | Yes, Your Honor. |
| THE COURT: | How so? |
| MS. STAMPS: | Because we already have a jury that has been empanelled [sic], sworn in, Your Honor. |
| THE COURT: | Okay. |
| MS. HARRIS: | There has been no testimony offered at this point, Your Honor. This incident was unforeseeable. It was unforeseen. It wasn't something that was created by man. Life happened to this doctor who is a material witness in this matter. |
| THE COURT: | Okay. Well, I'm interested in the double jeopardy because we have mistrials all the time and the law allows people to be retried. And this one has not gone that far. We've even had jurors to deliverate and not be able to return a verdict and the court declares mistrials, and those matters are tried all the time and that's not double jeopardy. So what would make this double jeopardy? |
| MS. STAMPS: | Your Honor, our position is that double jeopardy attaches at the point that the jury has been sworn in and empanelled [sic] and we would ask that the case be dismissed. |
| THE COURT: | All right. And the motion to dismiss will be denied. ***What is the prejudice to your client given that he's out on bond?*** If he were in jail then there would be some other issues that we would need to deal with. And I do understand he wants his day in court, but ***what would be the prejudice to your client at this point?*** |
| MS. STAMPS: | Just prejudice of having this hanging over his head, Your Honor. This is a three year old case. |

27

THE COURT: Well, usually, that's something the court mentions all the time and no one seems to be interested in that. So now it's a three year old case that the court has been desperately trying to get to trial. And the defendant is out on bond. ***There is no prejudice to this defendant***. The state is entitled to have all of their witnesses here. The court would do the same for the defendant if a witness was not available.

The court will deny the motion to dismiss. This is not a situation where the defendant is being subjected to double jeopardy. The matter will be reset for trial. The court wants this matter to proceed but, however, due to the fact that the witness is obviously not available, the court will declare a mistrial.

(Emphases added.)

¶61. The trial court then issued a written order declaring a mistrial that incorrectly stated that the "[j]ury retired to consider their Verdict, being in charge of Sworn officers of the Court, and presently, returned into open Court and stated that they are unable to agree upon a Verdict in said Cause. It is thereupon ordered by the Court that a MISTRIAL enter in said Cause." It is abundantly clear that the trial court found that a mistrial was appropriate because it was early in the proceeding and the defendant failed to demonstrate prejudice.

¶62. One month later, the defendant filed a motion to dismiss based on double jeopardy. It was only at the hearing on that motion that the trial court suddenly decided to clean up its earlier "findings" regarding the mistrial. It stated that

The Court granted mistrial, due to that emergency, in that if a mistrial had not been granted, the jury would have had to be here a number of days without trial testimony, and the Court found that that would have been inappropriate. The Court found that the mistrial was granted because of the family emergency of the witness of the State.

28

Consequently, the trial court found manifest necessity for the mistrial. Of course, these new "findings" were not actually what the trial court found in declaring the mistrial, nor does the record support these new "findings." The Court should disregard these later, unfounded "findings," and rely on the trial court's findings at the time of granting the mistrial.

¶63. A high degree of necessity must be found before a mistrial is appropriate. *Arizona v. Washington*, 434 U.S. 497, 506, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). An appellate court applies "the strictest scrutiny" in reviewing the grant of a mistrial "when the basis for the mistrial is the unavailability of critical prosecution evidence." *Id.* at 508. This Court has emphasized that it would be

> a prudent procedure for any trial court *before* declaring a mistrial would be to state into the record the reasons for declaring a mistrial. It is in his sound discretion to determine the necessity of declaring a mistrial, and upon any appeal his reasons as stated for the record will be accorded the greatest of weight and respect be an appellate court.

*Jones v. State*, 398 So. 2d 1312, 1318-19 (Miss. 1981) (emphasis added). It is clear that before declaring the mistrial, the trial court stated that the reason for granting the mistrial was that the defendant had not proven prejudice. This was inappropriate, as the burden is on the State to justify the mistrial.[14] "[T]he prosecutor must shoulder the burden of justifying the

---

[14]The majority attempts to obfuscate the fact that the trial court never required the State to meet its burden by claiming that the trial court found manifest necessity. Yet, the majority does not explain why the trial court did not require any showing of manifest necessity by the State, and did require a showing of unfair prejudice by the defendant. The majority does not credibly explain why the trial court did not consider multiple alternatives, except to say it is unknown if any of the alternatives would solve the issue; yet, the unknown and lack of findings regarding alternatives should tilt against the State, not the defendant. Lack of knowledge does not equal manifest necessity. In any event, to "prove" this point, the majority disregards the whole of the record and relies on one line spoken by the trial court that was stated after a lengthy discussion about how the trial court believed the

mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one." ***Washington***, 434 U.S. at 505. The prosecutor in this case did not shoulder that heavy burden, nor did the court require it of the prosecutor. Furthermore, a trial judge must, in determining whether to grant a mistrial, give "careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." ***Washington***, 434 U.S. at 514-16. The trial court gave no such consideration, and emphasized the court's opinion that a mistrial at such an early stage in the proceedings was fairly inconsequential.[15]

¶64. Nor did the trial court consider other alternatives. The trial court granted only a twenty minute recess to attempt to locate Dr. Davis. It could have granted a recess of a few hours to allow the State to speak to Dr. Davis himself. Furthermore, the State claimed that

---

defendant must, and did not, prove prejudice. The majority claims that this dissent "disregard[s]" and "wholly dismiss[es]" the trial court's reasons. It appears that the majority disregards and wholly dismisses all of the hearing record save one phrase, as well as the caselaw that requires a showing and finding of manifest necessity.

[15]The prohibition against double jeopardy is a "valued right" worthy of constitutional protection, because a second prosecution may be grossly unfair, even when the first trial is not completed. ***Washington***, 434 U.S. at 503.

> It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

***Id.*** at 503-05.

Dr. Davis had been properly subpoenaed.[16]  If so, and if he was in the area as claimed, the State could have sent an officer to attempt to enforce the subpoena.  These alternatives were not even considered, demonstrating a lack of "manifest necessity" for the mistrial.

¶65.   Moreover, even if this Court gives credence to the trial court's later "findings" attempting to clean up the original "findings," the record offers no support for those findings.  The State did not produce evidence to show that Dr. Davis had an "emergency" as they claim.  Indeed, while I acknowledge that this time must have been difficult for Dr. Davis and his family, hospice is, by its very definition, not an emergency.  An "emergency" is defined as "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or "[a]n urgent need for relief or help."  *Emergency*, Black's Law Dictionary (10th ed. 2014).  "Hospice" is defined as care for "terminally ill patients."  Miss. Code Ann. § 41-85-3(d) (Rev. 2013).  "Terminally ill" is defined as

> a medical prognosis of limited expected survival, of six (6) months or less at the time of referral to a hospice, of an individual who is experiencing an illness for which therapeutic strategies directed toward cure and control of the disease alone outside the context of symptom control are no longer appropriate.

Miss. Code Ann. § 41-85-3(k) (Rev. 2013).  Someone being placed in hospice care, by its very definition, would not be "sudden," "unforeseen," or "urgent."  Sad, yes, but not emergent.   The State failed to prove otherwise and that this was even an "emergency."

---

[16]The State produced a subpoena of Dr. Davis, but no return as executed is in the record and the subpeona is not on the docket.  The State's other subpoenas are on the docket. It is unclear from the record whether the State even served Dr. Davis with the subpoena and thus validly summoned him to court for the trial, despite the majority's misleading assertion that Dr. Davis was subpoenaed.

Further, absolutely no evidence was adduced about when Dr. Davis could get to court. The trial court, in its later "findings," stated that "the jury would have had to be here a number of days without trial testimony." Yet, Dr. Davis may have been available that very afternoon, or the next day. The State produced no evidence that he would not be available for several days, only that he was not currently at court and that they had not been able to speak with him directly. The ambiguity in the timing of his return must be held against the State for not meeting their heavy burden, not the defendant.

¶66. When we apply the strictest of scrutiny to review of this case, it is clear that the State failed to demonstrate manifest necessity for the mistrial. The double jeopardy bar prohibited Montgomery's second trial. I would reverse and render his conviction, and consequently dissent.

**KITCHENS, P.J., AND COLEMAN, J., JOIN THIS OPINION.**