# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00473-SCT

*DWAYNE LELAND WILSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2021 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| TRIAL COURT ATTORNEYS: | JOHN ANTHONY PIAZZA |
| | DENNIS LEE BISNETTE |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | HUNTER N. AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/28/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Dwayne Wilson appeals his conviction of aggravated assault under Mississippi Code Section 97-3-7(2)(a) (Rev. 2020). Wilson contends that his second trial violated the constitutional protection against double jeopardy. Additionally, Wilson claims that the verdict was against the overwhelming weight of the evidence.

¶2. Although the protections against double jeopardy had attached, the trial court did not abuse its discretion by finding manifest necessity to grant a mistrial. Furthermore, Wilson's

verdict was not against the overwhelming weight of the evidence. Accordingly, this Court affirms the judgment of the Jones County Circuit Court.

## PROCEDURAL HISTORY

¶3.    A grand jury indicted Wilson on one count of aggravated assault under Section 97-3-7(2)(a). The indictment charged that Wilson "unlawfully, willfully, purposely and feloniously attempt[ed] to cause or knowingly caused bodily injury to . . . Stacy Pierce[] by striking him multiple times in the ribs and mouth with a bat, a means likely to produce death or serious bodily harm[.]" Wilson pled not guilty.

¶4.    Trial was set for November 17, 2020 (the first trial).  During the first trial, defense counsel, during opening statements, improperly referenced the fact that Pierce, the victim and witness, was incarcerated on an unrelated felony DUI.  The State moved for a mistrial, which the trial court granted.

¶5.    The trial was reset, and Wilson moved to dismiss the charges based on double jeopardy, arguing that there was no "manifest necessity" for a mistrial. Before the next trial, the State and defense counsel filed numerous motions relating to the admissibility of Pierce's prior convictions. The trial court found that evidence of Pierce's convictions could be admitted if Wilson laid the proper foundation and followed the procedure for introducing character evidence under Mississippi Rules of Evidence 609, 403, and 404. In fact, at Wilson's second trial, information about Pierce's convictions was admitted.

¶6.    The second trial began on April 6, 2021. A Jones County jury convicted Wilson of one

2

count of aggravated assault under Section 97-3-7. Wilson was sentenced to fifteen years in the custody of the Mississippi Department of Corrections.

¶7. This appeal followed. Wilson makes two arguments. First, Wilson argues that the second trial violated the constitutional right against double jeopardy because there was no manifest necessity for a mistrial. Next, Wilson argues that his conviction is against the overwhelming weight of the evidence because Wilson's actions had been in self-defense.

## DISCUSSION

### I.    Double Jeopardy

¶8. On appeal, double jeopardy is reviewed de novo. *Brent v. State*, 296 So. 3d 42, 49 (Miss. 2020) (citing *Stewart v. State*, 131 So. 3d 569, 574 (Miss. 2014)).

¶9. "[T]he Fifth Amendment protection against 'double jeopardy attaches in any criminal proceeding [in Mississippi] at the moment the trial jury is selected and sworn to try the case.'" *Montgomery v. State*, 253 So. 3d 305, 310 (Miss. 2018) (quoting *Jones v. State*, 398 So. 2d 1312, 1314 (Miss. 1981)). In Wilson's first trial, the jurors were empaneled and sworn in before the trial court granted a mistrial. Therefore, the protections afforded by double jeopardy had attached.

¶10. Wilson argues that the second trial violated the constitutional protection against double jeopardy because his counsel's inflammatory comment during opening statements did not create a manifest necessity to end the first trial. Wilson claims that one improper statement is not so "highly prejudicial as to warrant a mistrial." The State argues that the trial

3

court did not abuse its discretion because defense counsel's inflammatory statement created a manifest necessity to warrant a new trial.

¶11. "If a mistrial is granted upon the court's motion or upon the State's motion, a second trial is barred because of double jeopardy, unless taking into consideration all the circumstances that there was a 'manifest necessity' for the mistrial." *Jenkins v. State*, 759 So. 2d 1229, 1234 (Miss. 2000) (citing *Watts v. State*, 492 So. 2d 1281, 1284 (Miss. 1986)).

> [T]here is no simple rule or formula defining the standard of "manifest necessity" or when exceptional circumstances exist justifying a declaration of mistrial by the trial court. The question is not easily answered. . . . *[T]he determinations must be made by the trial judge fulfilling his somber responsibility as to when justice requires him to declare a mistrial.*

*Harris v. State*, 321 So. 3d 556, 561 (Miss. 2021) (emphasis added) (quoting *Jenkins*, 759 So. 2d at 1235). "The fact that there is no explicit finding on part of the trial court of manifest necessity is not reversible error if the record supports such a finding." *Spann v. State*, 557 So. 2d 530, 532 (Miss. 1990) (citing *Arizona v. Washington*, 434 U.S. 497, 513-14, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978)).

¶12. Manifest necessity may be found when the jury fails to agree on a verdict; when jurors are biased; when the jury is otherwise tainted; when the jury is improperly separated; and "when jurors demonstrate their unwillingness to abide by the instructions of the court." *Jenkins*, 759 So. 2d at 1235 (citing *Spann*, 557 So. 2d at 532). Manifest necessity may also exist when a juror failed to divulge familial relations to a law enforcement officer during venire. *Id.* at 1235 (citing *Box v. State*, 610 So. 2d 1148, 1152-53 (Miss. 1992)).

4

¶13. When the trial court declares a mistrial based on a biased or deadlocked jury, the trial court "is entitled to 'broad deference.'" *Montgomery*, 253 So. 3d at 311 (citing *United States v. Fisher*, 624 F.3d 713, 718 (5th Cir. 2010)). Yet when a mistrial is granted because of "the unavailability of critical prosecution evidence[,]" then the trial court's decision "must survive the 'strictest scrutiny.'" *Id.* at 311 (internal quotation marks omitted) (citing *Fisher*, 624 F.3d at 718). Furthermore, a trial court's decision is also reviewed under the strictest scrutiny "when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Washington*, 434 U.S. at 508 (citing *Downum v. United States*, 372 U.S. 734, 736, 83 S. Ct. 734, 10 L. Ed. 2d 100 (1963)).

¶14. During opening statements at the first trial, defense counsel said, "I've not spoken with Mr. Pierce. I know he's in custody right now for a drug charge." The State objected and moved for a mistrial. Defense counsel responded and said that Pierce's incarceration for an unrelated drug charge was relevant to Pierce's "bad" character. The trial court excused the jury and asked the court reporter to repeat defense counsel's statement. The trial court also requested a copy of Mississippi Rule of Criminal Procedure 23.5.

¶15. The State noted that Pierce had not been convicted of the charge. The State's position was that defense counsel was trying to impugn Pierce's character with an irrelevant charge that had not yet been proved. Notably, the State agreed that Pierce's prior aggravated assault convictions were permissible in opening statements.

5

¶16.    Defense counsel countered and argued that Pierce's character could be attacked. Defense counsel argued that any reference to Pierce's character was far from prejudicial because, as the State had earlier admitted, Pierce had been convicted of aggravated assault and had a questionable character.

¶17.    The trial court noted that Pierce's recent arrest was for something unrelated to Wilson's aggravated assault charge. The trial court said that Pierce's unrelated arrest occurred after the alleged aggravated assault and "would not have any relevance to this incident that we're here on trial for today." The trial court said that "something that has happened since this incident – I mean, the implication is to try to say to the jury that since he's been subsequently arrested for a drug offense, he must have been acting in conformity back at the time . . . [of the aggravated assault]."

¶18.    At the first trial, the trial court grappled with whether a limiting instruction could purge the taint of defense counsel's opening statement. The trial court emphasized the "irreparable prejudice" caused by defense counsel's statements. After consulting the rules, the trial court found that even if Pierce, the victim, were convicted of his drug charges,

> it would not necessarily be relevant in this case because the charge has *nothing to do with his character for truthfulness*; and the second thing is that he's not been convicted of that. But you all now have it before you that the man that is – that the State claims to be the *victim in this case is coming over to the trial straight from the jail*; and *in my judgment*, that is *substantial* and *irreparable prejudice* to the case of the State of Mississippi, the movant in this case.

(Emphasis added.) Therefore, the trial court granted a mistrial for concerns that the jury would be biased. Consequently, the trial court's decision is "entitled to broad deference."

6

*Montgomery*, 253 So. 3d at 311 (citing *Fisher*, 624 F.3d at 718).

¶19.    Wilson argues that the trial court should have issued a limiting instruction or taken action other than granting a mistrial. However, the United States Supreme Court has recognized "that the extent of the possible bias cannot be measured, and that . . . some [trial courts] might have proceeded with the trial after giving the jury appropriate cautionary instructions" rather than a mistrial. *Washington*, 434 U.S. at 511. "Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. The Court further said that

> There are compelling institutional considerations mitigating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their *voir dire* examination. He is the judge most familiar with the evidence and the background on the trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be. *See Wade v. Hunter*, 336 U.S. 684, 687, 69 S. Ct. 834, 836, 93 L. Ed. 974 (1949).

*Id.* (footnotes omitted).

¶20.    A review of the record indicates that the trial court exercised extensive discretion before declaring a mistrial. First, the trial court gave both defense counsel and the State full opportunity to explain their positions on the possibility of a mistrial. Second, the trial court consulted Mississippi Rule of Criminal Procedure 23.5. Third, the trial court considered

7

whether a limiting instruction could remedy the taint of the improper statement. Fourth, the trial court discussed the content and relevance of the improper statement. Lastly, the trial court gave a detailed explanation of the necessity for a mistrial.

¶21. "Since [the trial court] exercised 'sound discretion' in handling the sensitive problem of possible juror bias created by the improper comment of defense counsel, the mistrial order is supported by the 'high degree' of necessity which is required in a case of this kind." *Washington*, 434 U.S. at 516. Furthermore, "[n]either party has a right to have [their] case decided by a jury which may be tainted by bias; in these circumstances, 'the public's interest in fair trials designed to end in just judgments' must prevail over the defendant's 'valued right' to have his trial concluded before the first jury impaneled." *Id.* at 516-17 (footnotes omitted) (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 (1949)).

¶22. The dissent argues that "[n]o manifest necessity existed for a mistrial." Diss. Op. ¶ 57. The dissent asserts that a jury instruction to disregard the improper statement could have cured any prejudicial effect. Diss. Op. ¶ 62. In support, the dissent relies on *Pulphus v. State*, 782 So. 2d 1220 (Miss. 2001), and *Hughes v. State*, 735 So. 2d 238 (Miss. 1999). But neither *Pulphus* nor *Hughes* involved a pending charge for which the victim or witness was then incarcerated. In *Pulphus*, the State referenced *an earlier plea hearing* involving "a defendant *in another case*." *Pulphus*, 782 So. 2d at 1223-24 (emphasis added). And in *Hughes*, a State's witness, during cross-examination by the defense, mentioned that the defendant *had previously been in jail*. *Hughes*, 735 So. 2d at 256. Specifically, the witness

8

testified that she had cut the defendant's hair three times, the first being "a short time after [the defendant] got out of jail." ***Id.***

¶23. Here, unlike in ***Pulphus*** and ***Hughes***, Pierce was at the time of Wilson's trial incarcerated on an unrelated, *pending* drug charge. As the trial court noted, Pierce had not been convicted of the pending charge and "[wa]s coming over to the trial straight from the jail[.]" Having Pierce, the victim, testify while wearing prison garb for an unrelated, pending drug charge is, as the trial court determined, "substantial and irreparable prejudice[.]" No jury instruction would have cured the prejudicial effect.

¶24. The dissent further argues that the defense's statement regarding Pierce's incarceration for a drug charge was "harmless error." Diss. Op. ¶ 63. But, once again, the cases relied on are distinguishable because they involved *prior* bad acts. *See **Carter v. State***, 722 So. 2d 1258, 1260 (Miss. 1998) (sheriff had investigated a prior shooting at the defendant's mother's house between the defendant and her mother); ***McKee v. State***, 791 So. 2d 804, 810 (Miss. 2001) ( detective "testified that [the defendant], while confessing to the robbery, said that he needed help because he was still on crack cocaine"); and ***Pitchford v. State***, 45 So. 3d 216, 234 (Miss. 2010) (State speculated that the defendant "might have killed [other people] had they arrived on the scene right after the murder while [the defendant] was still in the store").

¶25. Here, unlike in ***Carter***, ***McKee***, and ***Pitchford***, the statement at issue did not reference a prior bad act. Instead, the statement referenced an unrelated, pending charge for which

Pierce was at that time incarcerated.

¶26.   The dissent claims that because "the State impinged Pierce's character to the jury prior to the defense statement at issue," no mistrial was necessary.  Diss. Op. ¶ 64.  But the State did not reference or mention a pending drug charge for which Pierce was then incarcerated. Instead, the State acknowledged that Pierce was "not the most upstanding young man" and that he "was doing some bad things out there *that night*."  And while the trial court ultimately deemed the evidence admissible in the second trial, the fact remains that *at the time the improper statement was made*, the unrelated drug charge was pending, and Pierce was then incarcerated on that charge.  The admission of a prior conviction is different from the admission of a pending charge for which a witness is then incarcerated.

¶27.   The basis for the trial court's mistrial order is adequately disclosed by the record, which includes the argument of counsel. The trial court also considered whether a limiting instruction could remedy defense counsel's improper statement. Therefore, when afforded great deference, the trial court did not abuse its discretion when it found that defense counsel's improper statements created manifest necessity to declare a mistrial. ***Montgomery***, 253 So. 3d at 311 (citing ***Fisher***, 624 F.3d at 718).  Consequently, Wilson's retrial was not barred by double jeopardy.

## II.   Overwhelming Weight of the Evidence

### A.   Standard of Review

¶28.   The denial of a motion for new trial is reviewed for abuse of discretion. ***Gilmore v.***

10

*State*, 119 So. 3d 278, 284 (Miss. 2009) (citing *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999)). "When reviewing challenges to the weight of the evidence, this Court views the evidence 'in the light most favorable to the verdict.'" *Williams v. State*, 305 So. 3d 1122, 1130 (Miss. 2020) (internal quotation marks omitted) (quoting *Williams v. State*, 285 So. 3d 156, 160 (Miss. 2019)). "When the weight of the evidence is challenged, this Court 'will reverse only when the verdict [is] so contrary to the weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Shelvy v. State*, 293 So. 3d 823, 829 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting *Naylor v. State*, 248 So. 3d 793, 796 (Miss. 2018)). "The evidence supporting the verdict must be extremely weak, tenuous, or doubtful for us to award a new trial." *Gilmore*, 119 So. 3d at 284 (citing *Dilworth v. State*, 909 So. 2d 731, 737 (Miss. 2005), *disagreed with on other grounds by Clark v. State*, 315 So. 3d 987, 1004 (Miss. 2021)).

### B. *Evidence Admitted*

¶29. The Laurel Police Department and the Jones County Sheriff's Department responded to a 911 call reporting a fight at a block party. Officers found Pierce, severely beaten, lying halfway under a car in the street. Police tended to Pierce until an ambulance arrived and took him to the hospital. At the hospital, it was discovered that Pierce suffered from two broken arms, broken ribs, fractures in his neck and face, and multiple knocked-out teeth. Wilson was identified as the culprit for Pierce's injuries during the investigation.

¶30. It is undisputed that officers were familiar with Pierce. Pierce was known to be

11

frequently intoxicated and to carry knives. In fact, it was agreed that Pierce was intoxicated at the time of the incident. It is undisputed that Pierce knocked over the stereo of LaShonda Hinton,[1] Wilson's girlfriend, sometime before the fight. The extent of Pierce's injuries is also undisputed.

¶31.    The jury heard from eight witnesses including Pierce, Wilson, Derrick McCurdy, and Felecia Dubose, each attendees at the block party; Officers Justin Landrum and John Stringer; and Investigators Steven Graeser and Michelle Howell. Additionally, the jury saw Wilson's interrogation video and clips from two officers' body cameras.

### 1.    Testimony of Stacy Pierce

¶32.    Pierce testified that Wilson ran toward him roughly thirty seconds after knocking over LaShonda's speaker. According to Pierce, Wilson "was in my face talking about, tore my old lady speaker up." Pierce said that the argument continued until Wilson "pushed me, and I pushed him and passed a couple licks and everything." Pierce said that LaShonda started yelling at him to leave and that he turned around and walked away from the block party. Pierce testified that he was not carrying a knife when Wilson attacked him.

¶33.    After he walked down the street, Pierce said that he heard LaShonda tell Wilson to "kill that son of a B." Pierce further testified that Wilson grabbed a bat and ran after him. Pierce said that Wilson was the first to hit him.  Pierce testified that Wilson hit him

---

[1] LaShonda Hinton, Shonda Hinton, LaShonda Barber, and Shonda Barber are referenced in the record. Although unclear, it appears that those names reference the same individual.

approximately thirteen to fifteen times with the bat.

¶34. Pierce admitted to having a drinking problem and a history of violence. Pierce admitted to his aggravated assault charge twenty-eight years earlier, to which he had pled guilty. Pierce also said that he pled guilty to his current incarceration for felony DUI. Pierce testified that he always admits to the crimes that he commits.

### 2.    Testimony of Dwayne Wilson

¶35. Wilson said that he was drinking at the block party when Pierce arrived. Wilson testified that Pierce was told he could not play dice because Pierce "always . . . want[s] to fight the person that takes his money." Wilson said that Pierce began arguing with a Felecia.[2] When LaShonda threatened to call the police, Wilson said that Pierce started to leave and bumped his shoulder as he walked away. Wilson testified that he told Pierce to "chill out."

¶36. Pierce proceeded down the road, and he abruptly turned around to argue with Wilson. Wilson said that Pierce was bragging about previously killing someone. Pierce supposedly pulled out a knife and advanced toward Wilson. Wilson threatened Pierce not to come any closer. Wilson said that Pierce got close and gestured something, so when Pierce turned around, Wilson swung the bat and hit Pierce. Wilson said he hit Pierce across the arms and then again in the jaw. During this, Wilson maintains that Pierce continued to wield a knife.

¶37. Wilson testified that he dropped the bat and walked away once he saw Pierce drop to

_____

[2] The record references a "Felecia Barber" and "Felecia Dubose." It appears that they are likely the same person. If there were two Felecias at the block party, then it is unclear which "Felecia" that Wilson is referring to.

the ground, injured from the hit across the jaw. Again, even after Pierce dropped to his knees, Wilson claimed that Pierce continued to hold a knife. Moments later, Wilson said that a group of unnamed individuals attacked Pierce. Wilson said that he did not have any scratches or bruises after the altercation with Pierce.

¶38. During Wilson's interrogation, after denying involvement for more than twenty minutes, he told investigators that he hit Pierce once. At trial, however, Wilson testified that he hit Pierce twice.

¶39. Wilson also talked about another fight during his interrogation video. Wilson said that the other fight started because someone disrespected his girlfriend, LaShonda. At trial, Wilson said that the altercation was just a misunderstanding and happened a week before the incident with Pierce.

¶40. At trial, Wilson said that he feared for his life. Wilson also said that he knew Pierce had been convicted of aggravated assault twenty-eight years earlier. The State, however, pressed Wilson on whether he told investigators that he feared Pierce, to which Wilson responded that he did not. The State also noted that investigator Graeser, during the interrogation, "basically set up self-defense and said, look if [Pierce] had a knife, he's coming at you, and it's self-defense, I understand that." Wilson responded that he did not understand that the investigators were asking about self-defense because he was nervous during the interrogation. Wilson admitted that he lied to investigators and averred that he was telling the truth at trial.

14

### 3. *Testimony of Felecia Dubose*.

¶41.    Felecia Dubose, Wilson's sister-in-law, testified that Pierce was the initial aggressor and had a knife. Dubose stated that Pierce threatened to kill everyone at the block party. Dubose also said that Wilson acted in self-defense.

¶42.    Dubose testified that she would have hit Pierce with the bat had Wilson not reached the bat first. The State questioned Dubose's credibility and bias towards the end of her testimony when it inquired into her lack of initiative to give defense counsel statements more than a year after the incident.

### 4. *Testimony of Derrick McCurdy*

¶43.    Derrick McCurdy testified that he saw Pierce walking down the road, followed by Wilson and three other unnamed individuals. McCurdy said Pierce "block[ed] licks" while Wilson hit him with a bat. McCurdy did not see who started the fight but witnessed Wilson hitting Pierce with a bat. After Wilson had left, McCurdy said that he checked on Pierce and found him lying on the ground. McCurdy said that he saw Keyterrian Buckhalter and Demario McDonald kicking a severely injured Pierce and told them to get away from Pierce.

¶44.    After the police left the scene, McCurdy said that Wilson came back to look for the bat. According to McCurdy, Wilson knew where to find the bat, picked it up, and said he did not have anything to do with it. McCurdy later discovered where Wilson left the bat because his godmother told him that it was found by a landlord nearby. McCurdy said that the bat was bent from the force used to beat Pierce.

¶45. It was also McCurdy's statements to police that led to the discovery of the bat. Interestingly, Investigator Howell testified that the location of the bat was not offered until McCurdy was a suspect of the aggravated assault.

### C. Overwhelming Weight of the Evidence

¶46. In relevant part, Section 97-3-7(2)(a) provides that:

> A person is guilty of aggravated assault if he or she (I) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]

Miss. Code. Ann. § 97-3-7(2)(a) (Rev. 2020). "As to a claim of self-defense, the jury is the ultimate judge of whether the defendant acted in a manner to justify self-defense." *Webster v. State*, 817 So. 2d 515, 519 (Miss. 2002) (citing *Rush v. State*, 278 So. 2d 456, 459 (Miss. 1973)).

¶47. "[T]he credibility of a witness is solely for the jury to weigh and consider." *Miller v. State*, 983 So. 2d 1051, 1054 (Miss. 2008) (citing *Harris v. State*, 970 So. 2d 151, 156 (Miss. 2007)).

> Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the

16

conflicting evidence presented a factual dispute for jury resolution. *Boone v. State*, 973 So. 2d 237, 243 (Miss. 2008) (citing *Givens v. State*, 967 So. 2d 1, 7 (Miss. 2007)). "Conflicting testimony does not evince overwhelming evidence; [w]here the verdict turns on the credibility of conflicting testimony and the credibility of the witness, it is the jury's duty to resolve the conflict." *Brown v. State*, 995 So. 2d 698, 702 (Miss. 2008) (alteration in original) (internal quotation mark omitted) (citing *Nicholson v. State*, 523 So. 2d 68, 71 (Miss. 1988)).

¶48. Wilson argues that "the overwhelming weight of the evidence showed that Wilson hit Pierce with the bat in the defense of himself . . . based on an imminent threat of serious bodily injury that was objectively reasonable and apparent to Wilson under the circumstances." The State argues that the record clearly supports Wilson's conviction. The State notes that Wilson was found guilty after the jury heard and considered all evidence presented and that they were instructed on Wilson's self-defense claim.

¶49. At trial, Dubose and Wilson both claimed that Pierce was threatening everyone at the party. The jury heard Wilson's testimony, that he feared Pierce, and watched his interrogation video, which differed, according to the transcript. At trial, Wilson testified that he feared for his life and was threatened by Pierce. Wilson also testified that he feared Pierce because he was aware that Pierce had been convicted of aggravated assault twenty-eight years earlier. During his interrogation, Wilson never suggested that he was scared or threatened by Pierce. Therefore, it was the jury's duty to resolve this conflict. *Cousar v. State*, 855 So. 2d 993, 999

(Miss. 2003) (citing ***Sturdivant v. State***, 745 So. 2d 240, 247 (Miss. 1999)).

¶50.    Pierce was known to carry a knife both by officers and individuals at the block party. Individuals at the block party claimed that Pierce had a knife when he was assaulted. Dubose testified that Pierce was threatening Wilson with a knife. Wilson also testified that Pierce threatened him with a knife. Wilson testified that Pierce did not drop the knife even after he hit Pierce in the jaw and the arms, which led to Pierce's kneeling. However, no knife was found on or near Pierce. Pierce testified that he did not have a knife. When testimony conflicts, it is the province of the jury to resolve. ***Bowman v. State***, 283 So. 3d 154, 163 (Miss. 2019) (citing ***Little v. State***, 233 So. 3d 288, 292 (Miss. 2017)).

¶51.    Wilson and Dubose claim that Pierce was the initial aggressor. Pierce claims that Wilson was the initial aggressor. Officers also speculated, without objection, that Pierce may have been retreating based on where he was found. Importantly, "[t]estimony of a single witness [may be] enough to support a conviction, even though denied by the accused." ***Young v. State***, 236 So. 3d 49, 56 (Miss. 2017) (citing ***Nash v. State***, 278 So. 2d 779, 780 (Miss. 1973)).

¶52.    Wilson admitted that he intended to hit Pierce. But Wilson claims that he acted in self-defense. "To the extent [Wilson] claims that the State failed to rebut his self-defense theory, that was a question for the jury, not this Court." ***Bernard v. State***, 288 So. 3d 301, 307 (Miss. 2019) (citing ***Newell v. State***, 175 So. 3d 1260, 1268 (Miss. 2015)).

¶53.    The jury was instructed on aggravated assault and self-defense. The State provided

ample evidence, primarily Pierce's detailed account, for a reasonable jury to believe that Wilson purposefully and knowingly hit Pierce with a bat, that Wilson was the aggressor, and that Wilson did not act in self-defense. Considering all of the testimony, including references to Pierce's past, the jury found Wilson guilty of aggravated assault.

¶54. The trial court did not abuse its discretion by denying Wilson a new trial, and ample evidence overcame theory of self-defense. Allowing the jury's verdict to stand does not sanction an "unconscionable injustice." **Shelvy**, 293 So. 3d at 829 (internal quotation marks omitted) (quoting **Naylor**, 248 So. 3d at 796). Therefore, Wilson's conviction and sentence are affirmed.

## CONCLUSION

¶55. The judgment of the Jones County Circuit Court is affirmed.

¶56. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶57. No manifest necessity existed for a mistrial in Wilson's first trial. His second trial consequently violated his Fifth Amendment right against double jeopardy. I therefore respectfully dissent.

¶58. During opening statements, Wilson's attorney mentioned that witness statements had changed and stated "I've not spoken with Mr. Pierce. I know he's in custody right now for

19

a drug charge. I've not spoken with him . . . ." The State immediately moved for a mistrial. The State argued that "you cannot use a charge that he is not convicted of at this point to prove that he acted in conformity with that. . . . All he's trying to do is impinge his conduct or his character with something that's irrelevant[.]" The defense argued that the State had opened the door to Pierce's character. During voir dire, the State told the jury venire that "the victim in this case - - I guess the way I put it is probably not the most upstanding young man you'll ever meet in your life. He was doing some bad things out there that night." The State went on to discuss the notion of "karma" and people doing bad things getting what they deserve, and asked the jury venire if they could put aside such a notion. The defense objected to this "as an improper hypothetical" and the trial court overruled the objection.

¶59. In determining whether to grant the mistrial, the trial court queried whether defense counsel's statement could be cured by a jury instruction. The State argued that it could not and that the State could not say that a defendant is in jail; thus, "if it's fair for the defendant, then it's fair for the State[.]" The trial court determined that even if Pierce had been convicted of the charge, it would not be relevant, and "that is substantial and irreparable prejudice to the case of the State of Mississippi[.]" The court then granted a mistrial.

¶60. By Wilson's second trial, Pierce had pled guilty to the DUI charge at issue in the first trial.[3] The trial court allowed the defense to question Pierce regarding the fact that he was

---

[3]While Pierce had only been charged and not convicted during the first trial, prior bad acts evidence is not limited to prior convictions. *Cole v. State*, 126 So. 3d 880, 884 (Miss. 2013).

20

then serving time for DUI third. The defense had argued that Pierce's alleged propensities for violence and excessive alcohol consumption were relevant to its self-defense claim.

¶61. To avoid the double jeopardy bar, the prosecutor must bear a heavy burden of demonstrating "'manifest necessity' for any mistrial declared over the objection of the defendant." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). Further, when deciding whether to grant a mistrial, the trial court must "accord[] careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." *Id.* at 516. The trial court repeatedly emphasized its belief that the defense prejudiced the State, but it did not analyze or appear to consider Wilson's interest in having the trial concluded in a single proceeding.

¶62. This Court has held that "it is not per se prejudicial to a defendant if a jury simply hears an isolated instance of a crime or bad act in the course of a trial." *Brown v. State*, 890 So. 2d 901, 913 (Miss. 2004). We have also noted that improper prosecutorial comments may be rendered harmless by a jury instruction that arguments and statements of counsel are not evidence, and that any such statements having no basis in the evidence should be disregarded. *Walker v. State*, 913 So. 2d 198, 241 (Miss. 2005). "[W]hen an objection is sustained, and the trial judge admonishes the jury to disregard the statement, this Court will usually find no error, absent unusual circumstances." *Pulphus v. State*, 782 So. 2d 1220, 1223 (Miss. 2001) In *Pulphus*, the State improperly referenced an earlier plea hearing. *Id.* The trial court admonished the jury to disregard the statement, and this Court found that "the

instructions and statements of the trial judge cured any potential prejudice." *Id.* at 1223-24.

Indeed, when the trial court has given a cautionary jury instruction that the jury is to disregard testimony that the defendant had previously been in jail and the defendant moved for a mistrial, this Court has held that the improper and inadmissible testimony "was cured the *best way possible* under the circumstances then existing with the judge's instruction." *Hughes v. State*, 735 So. 2d 238, 257 (Miss. 1999) (emphasis added).

> The better remedy for an improper comment or question that has been put before the jury is for the court to admonish the jury not to consider the improper statement. It is only when the comment is so prejudicial that the curative instruction would not suffice to ensure the defendant a fair trial that reversal is warranted. This rule is but a specific application of the general presumption that juries will follow instructions which are given to them and do not rely on the good or bad faith of the prosecutor.

*Id.* at 256 (citations omitted).[4]

¶63. Moreover, this Court has often found that improper introduction of a defendant's own prior bad acts at trial is harmless error. In *Carter v. State*, the State elicited testimony that the sheriff had responded to a shootout between the defendant and her mother. *Carter v. State*, 722 So. 2d 1258, 1260 (Miss. 1998). The defendant was not convicted for any crime based on this alleged incident. *Id.* at 1261. The Court found "that erroneous admission of Sheriff Farrior's rebuttal testimony did not prejudice Carter to such an extent as to require reversal." *Id.* at 1262. In *McKee v. State*, a State witness testified that the defendant was on

---

[4]The majority distinguishes this case by pointing out that the testimony was that the defendant had been in jail, rather than a witness. It is correct that this case is different—this case is worse, because a defendant's rights carry more weight than a witness's character.

drugs. *McKee v. State*, 791 So. 2d 804, 810 (Miss. 2001). This Court found that any

prejudice regarding drug testimony "dims in light of the overwhelming evidence of McKee's

guilt presented by the State and in light of the fact that McKee's own counsel repeatedly

emphasized his prior theft convictions." *Id.* at 811. In *Pitchford v. State*, the prosecutor

speculated that the defendant would have killed other people given the opportunity during

his closing statement. *Pitchford v. State*, 45 So. 3d 216, 234 (Miss. 2010). This Court found

that the statement was improper and that the trial court should have sustained the defense's

objection to it. *Id.* at 235. However, this Court held that "in the context of this case, with

the overwhelming evidence of guilt presented to the jury, we find this inappropriate

statement, and the trial judge's incorrect ruling, to be harmless error." *Id.* Certainly, if a

defendant's bad acts being mentioned are not so prejudicial as to warrant reversal by this

Court, one isolated comment regarding a witness's character is not so prejudicial to the State

as to create a manifest necessity for a mistrial.[5] This is particularly true in this case because

the State had already diminished Pierce's character to the jury prior to the statement made

by the defense.

¶64. The State did not meet its burden to demonstrate manifest necessity for a mistrial in

this case. First, the State impinged Pierce's character to the jury prior to the defense

---

[5]The majority completely misconstrues this argument, asserting that I argue that the defense statement was harmless error. The majority is incorrect. Harmless error is clearly not applicable in this procedural posture. I merely make an analogy to all the cases this Court has declined to reverse when similar circumstances occured harming a defendant's reputation.

statement at issue. In light of that impingement, the defense's one isolated statement was not so highly prejudicial as to warrant manifest necessity for a mistrial. Indeed, this Court has consistently ruled that even more inflammatory statements regarding a defendant, not a witness, were not unduly prejudicial. And certainly a defendant's constitutional rights should be of more import than a witness's character. Second, this Court consistently holds that instructions to the jury to disregard improper statements cure the impropriety absent unusual circumstances. The State demonstrated no unusual circumstances that demonstrate that a jury instruction would not be curative. Third, the trial court ultimately deemed that the evidence was admissible, undermining the reasoning for declaring a mistrial. In making its determination, the trial court did not consider the defendant's interests in having a single proceeding before declaring a mistrial, but only considered alleged prejudice to the State. It ultimately abused its discretion by granting the mistrial because the State did not show manifest necessity, and the trial court failed to consider Wilson's competing interests. Wilson's second trial therefore violated the protection against double jeopardy, and we should consequently reverse and render his conviction.

**KITCHENS, P.J., JOINS THIS OPINION.**